WALLACE, Circuit Judge,
dissenting:
I respectfully dissent. Our decision in Sternberg, properly read, controls this case and requires reversal. However, even if it did not control, we should still reverse.
*1103 Although these errors are significant, they solely affect the outcome of this case. More troubling is the BAP’s decision to rely upon one of its own cases, notwithstanding the fact that we had previously rejected the statement of law at issue. The implications of such cavalier disregard by the BAP for its subordinate status within the federal judiciary are far-ranging, and merit much greater attention than the majority bestows on them.
I.
Schwartz-Tallard voluntarily petitioned for Chapter 13 bankruptcy in March 2007 in the Bankruptcy Court for the District of Nevada. In February 2009, America’s Servicing Company (ASC), a creditor of Schwartz-Tallard’s, contended that she failed to make payments on a note held by ASC. ASC moved the bankruptcy court to lift the automatic stay so it could foreclose upon property Schwartz-Tallard owned in which ASC held a security interest. On April 6, 2009, the bankruptcy court vacated the automatic stay so ASC could foreclose on the property.
Schwartz-Tallard moved to reinstate the stay for the property on May 6, 2009. She argued she had not failed to make payments on the note so the lifting of the stay was erroneous, and requested swift relief from the bankruptcy court because ASC had announced it would sell the property on May 20, 2009. On May 13, 2009, the bankruptcy court held a hearing and orally granted Schwartz-Tallard’s motion to reinstate the stay as to the property. The bankruptcy court did not enter a written order memorializing the reinstatement of the stay (the Reinstatement Order), however, until June 3, 2009. In the interim, ASC sold the property in a foreclosure sale on May 20, 2009.
On June 9, 2009, Schwartz-Tallard moved the bankruptcy court to sanction ASC for the sale, which had occurred despite the oral order reinstating the stay. The bankruptcy court heard the motion on January 7, 2010. During the long period between when the Reinstatement Order was entered on the docket and the hearing on the sanctions motion, ASC did not convey the property back to Schwartz-Tal-lard. At the hearing, the bankruptcy court ordered the property returned to Schwartz-Tallard, and ASC acceded. The bankruptcy court ordered sanctions imposed for a number of reasons, including ASC’s improper motion in February 2009 to set aside the automatic stay, ASC’s sale of the property on May 20, 2009 despite the oral grant of reinstatement on May 13, and for ASC’s failure to reconvey the property after the Reinstatement Order was entered onto the docket. The bankruptcy court also awarded Schwartz-Tal-lard attorneys’ fees and fees for emotional damages. The bankruptcy court entered an order on February 17, 2010 directing the property to be put back to Schwartz-Tallard’s name and memorializing the sanctions and attorneys’ fees (Conveyance and Sanctions Order).
On March 2, 2010, ASC filed a notice of appeal from the Conveyance and Sanctions Order. ASC finally put the property back in Schwartz-Tallard’s name on March 3, 2010.
ASC filed its appellate brief in the district court on May 10, 2010, in which ASC attacked the Conveyance and Sanctions Order on five grounds. First, ASC argued that the bankruptcy court’s oral order of May 13, 2009 did not take effect immediately, so “any sanctions based upon [the bankruptcy court’s conclusion in the Conveyance and Sanctions Order that the foreclosure sale of May 20, 2009 violated the stay] must be reversed.” Second, ASC argued that it had not been required to undo the foreclosure sale and reconvey the *1104 property back to Schwartz-Tallard until the hearing on January 7, 2010, so the bankruptcy court’s “award of damage attributed to th[e] erroneous legal conclusion [that ASC had continued to violate the automatic stay from May 13, 2009 to when it returned the property to Schwartz-Tal-lard] must be reversed.” Third, ASC argued that the damages the bankruptcy court awarded to Schwartz-Tallard “were not properly awarded under [Federal Rule of Bankruptcy Procedure] 9011,” which governed the sanctions award. Fourth, ASC argued that the amount of attorneys’ fees awarded to Schwartz-Tallard was unreasonable. Fifth, ASC argued that the bankruptcy court erred in awarding Schwartz-Tallard emotional damages.
Critically, all five of these arguments attacked the amount and propriety of the sanctions and fees awarded to Schwartz-Tallard. ASC never argued that Schwartz-Tallard actually defaulted on her note, as it had originally argued in February 2009. ASC did not attack the validity of the Reinstatement Order. That meant ASC never challenged the bankruptcy court’s conclusion in the Conveyance and Sanctions Order that the property should be conveyed back to Schwartz-Tallard. If ASC’s appeal had been wholly successful, it would not have owed Schwartz-Tallard any money. But ASC would not have retaken Schwartz-Tallard’s property.
Schwartz-Tallard filed an answering brief on June 3, 2010. In her brief, she stated that ASC’s “main argument is that the Bankruptcy Court did not follow the proper procedure in awarding sanctions and damages under F.R.B.P. 9011.” She did not defend the bankruptcy court’s judgment ordering the property returned to her.
The district court issued an order on September 14, 2010. In that order, the court affirmed most of the Conveyance and Sanctions Order, but rejected some of the attorneys’ fees calculations made by the bankruptcy court. On remand, the bankruptcy court reassessed those attorneys’ fees.
On February 16, 2011, Schwartz-Tallard moved for additional attorneys’ fees before the bankruptcy court. She argued that ASC owed her $10,103.00 for attorneys’ fees she incurred by defending ASC’s appeal of the Conveyance and Sanctions Order. In an oral hearing on July 12, 2011, the bankruptcy court rejected her motion, holding that Schwartz-Tallard was “not entitled to [those] fees for the sole reason that I believe that Sternberg [v. Johnston, 595 F.3d 937 (9th Cir.2010) ] precludes the award of attorneys fees on appeal.” The bankruptcy court continued that because “the wrongful act,” namely ASC’s failure to return her property in contravention of the Reinstatement Order, “stopped before the appeal [ ] the attorneys fees don’t continue through there.” Though the bankruptcy court stated its belief that Stern-berg was wrongly decided, and that Schwartz-Tallard should receive these fees, “I’m bound by what I believe Stern-berg says.” The bankruptcy court entered a written order on July 26, 2011.
In Sternberg, we considered the scope of “actual damages” under 28 U.S.C. § 362(k)(1). Section 362(k)(l) allows “an individual injured by any willful violation of [the automatic] stay ... [to] recover actual damages, including costs and attorneys’ fees ...” We concluded that “actual damages” does not include attorneys’ fees expended by the debtor for the prosecution of an adversary proceeding to recover damages suffered from a violation of the stay. Sternberg, 595 F.3d at 945-48.
Schwartz-Tallard appealed the bankruptcy court’s denial of the $10,103.00 in appellate attorneys’ fees she sought. The bankruptcy court had suggested at the *1105 July 12 hearing that the appeal be taken directly to this court under 28 U.S.C. § 158(d)(2), so we could potentially reconsider Sternberg. The bankruptcy court rethought that suggestion, though, and denied Schwartz-Tallard’s request for direct certification to our court, presumably because the court concluded that Sternberg was controlling.
Schwartz-Tallard’s appeal proceeded before the Bankruptcy Appellate Panel (BAP). In her brief, Schwartz-Tallard offered two possible distinctions of Stern-berg, but mostly focused on her argument that our decision in that case “ha[d] been sharply criticized by other courts.” ASC disagreed with Schwartz-Tallard’s distinctions, but pointed out that Schwartz-Tal-lard had basically “concede[d] that Stern-berg is binding.” Thus far, the bankruptcy court and even the parties seemed to agree that Schwartz-Tallard could not recover attorneys’ fees for defending ASC’s appeal of the Conveyance and Sanctions Order under our decision in Sternberg.
But then the BAP issued its decision. In re Schwartz-Tallard, 473 B.R. 340 (9th Cir. BAP 2012). The BAP first attempted to distinguish Schwartz-Tallard’s appeal from Sternberg. The BAP concluded that the defense of an opposing party’s appeal “is fundamentally different” from the affirmative adversary proceeding action filed by the debtor in Sternberg. Schwartz-Tallard, 473 B.R. at 349. Unlike in Stern-berg, said the BAP, Schwartz-Tallard was “not using the automatic stay as a sword to pursue damages from ASC.” Id.
After attempting to distinguish this case from Sternberg, the BAP held that Schwartz-Tallard is entitled to attorneys’ fees for her defense of ASC’s appeal, because the defense of the appeal “was consistent with the goals of the automatic stay identified by the court in Sternberg,” and ASC’s appeal “deprive[d] [Schwartz-Tal-lard] of the benefits of her automatic stay,” so her “defense of the bankruptcy court’s decision was an extension of her efforts to enforce her automatic stay.” Id. The BAP suggested that Schwartz-Tallard was entitled to attorneys’ fees because ASC’s stay violation was not remedied until ASC lost its appeal. Id. at 350 (“[o]f course, in Sternberg, the point at which the stay violation had been ‘remedied’ was clear.... In contrast, here, while the Property was finally reconveyed to [Schwartz-Tallard] the day after ASC filed its notice of appeal, [Schwartz-Tallard] was forced to defend that appeal to validate the bankruptcy court’s ruling”). The BAP also relied on its prior decision of In re Walsh, where it held that “[c]learly, fees and costs experienced by an injured party in resisting the [stay] violator’s appeal are part of the damages resulting directly from the stay violation.” Id., quoting In re Walsh, 219 B.R. 873, 878 (9th Cir. BAP 1998).
The majority now affirms the BAP. The basic structure of the majority’s opinion is the same as the BAP’s. First, the majority attempts to distinguish Sternberg. The majority states that there we “specifically held” “that any fees a debtor incurs ‘in pursuit of a damage award’ are not covered” by section 362(k)(l). Majority Op. at 1101. Here, however, the majority asserts that Schwartz-Tallard “was not pursuing a damage award,” was “remedying the stay violation,” and “was not using the stay as a sword.” Majority Op. at 1101. The majority then explains why Schwartz-Tallard is entitled to attorneys’ fees: it believes awarding these fees is consistent with the plain language of section 362(k)(l), and in the absence of Stern-berg ’s limitations, awarding those fees “is consistent with both the financial and non-financial purposes of the automatic stay that we emphasized in Sternberg.” Id. at 1102.
*1106 II.
The majority errs in several respects, but the most significant of its mistakes is its failure to recognize that Sternberg controls this case. The majority characterizes the holding of Sternberg as “any fees a debtor incurs ‘in pursuit of a damage award’ are not covered” as “actual damages” under section 362(k)(l). Majority Op. at 1101-02, quoting Sternberg, 595 F.3d at 947. But that is not the holding of Sternberg. The holding of Sternberg is that “actual damages” are “an amount awarded to compensate for a proven injury or loss.” Id. at 947. Only attorneys’ fees “related to enforcing the automatic stay and remedying the stay violation” constitute actual damages. Id. at 940.
On March 3, 2010, ASC returned the property to Schwartz-Tallard. That ended and remedied the violation of the automatic stay. On May 10, 2010, ASC filed its opening brief in the appeal. By not seeking to retake Schwartz-Tallard’s property then, ASC waived its right to do so. By May 10, 2010, at the latest, it was both evident to Schwartz-Tallard and legally true that ASC’s appeal was not related to enforcing the automatic stay or remedying the stay violation. Instead, the only possible result of Schwartz-Tallard’s defense of ASC’s appeal was to maintain the sanctions she had been awarded by the bankruptcy court. Attorneys’ fees expended to that end are not actual damages under Sternberg.
A.
In Sternberg, we interpreted 11 U.S.C. § 362(k)(1), which allows an individual injured by a willful violation of the automatic stay “actual damages, including costs and attorneys’ fees.” We determined that a debtor “can recover as actual damages only those attorney fees related to enforcing the automatic stay and remedying the stay violation.” 595 F.3d at 940. We stated that section 362(k)(l) did not define “actual damages,” which we considered an ambiguous phrase. Id. In order to define the term, we turned to Black’s Law Dictionary, which defines “actual damages” as “an amount awarded to compensate for a proven injury or loss.” Id., quoting BlaCK’s Law DICTIONARY 416 (8th ed.2004). The next sentence is the holding of Stern-berg: “the proven injury [and thus, actual damages under section 362(k)(l) ] is the injury resulting from the stay violation itself.” Id. We later made clear that under our precedent the automatic stay “is designed to effect an immediate freeze of the status quo.” Id. at 948, quoting Hillis Motors, Inc. v. Hawaii Auto. Dealers’ Ass’n, 997 F.2d 581, 585 (9th Cir.1993).
In this case, the parties were returned to the status quo when Schwartz-Tallard received her property back from ASC. That occurred on the date ASC recon-veyed the property, March 3, 2010. Once the status quo was re-established, the violation of the stay ended. Id.; Hillis, 997 F.2d at 585.
ASC appealed the Conveyance and Sanctions Order that required it to return the property to Schwartz-Tallard on March 2, 2010. In that appeal, ASC conceivably could have argued that the Reinstatement Order was erroneous, and that the property should revert. But it did not do so. In its appeal brief to the district court, filed on May 10, 2010, ASC sought only to reduce or reverse the award of damages owed to Schwartz-Tallard. By failing to attack the Reinstatement Order or otherwise argue that Schwartz-Tallard had defaulted on her note and was not entitled to the property, ASC waived any argument that could have led to retaking the property under the Nevada Local Rules and the Federal Rules of Bankruptcy Procedure. D. Nev. L.R. 8018 (“[p]rac- *1107 tice in bankruptcy appeals that may come before the district court will be governed by Part VIII of the Federal Rules of Bankruptcy Procedure”); Fed. R. Bankr.P. 8010(a)(1)(C) (appellate briefs must contain “[a] statement of the issues presented and the applicable standard of appellate review”); In re Marquam Inv. Corp., 942 F.2d 1462, 1467 (9th Cir.1991) (“failure to comply with Rule 8010(a)(1)(C) waives [an] issue on appeal”).
After ASC waived any attempt to retake Schwartz-Tallard’s property, the appeal was limited to whether and in what amount ASC owed Sehwartz-Tallard damages. This is made particularly clear by the substance of Schwartz-Tallard’s answering brief, filed on June 3, 2010. In that brief, for which Sehwartz-Tallard seeks attorneys’ fees in this appeal, Sehwartz-Tallard defended the bankruptcy court’s award of sanctions, but never argued (because ASC had never argued to the contrary) that the property should remain with her. Thus, on May 10, 2010, the stay violation had been remedied by the Conveyance and Sanctions Order, because the status quo had been returned, and ASC could no longer disrupt that status quo. All litigation Sehwartz-Tallard engaged in after May 10, 2010 was not “related to enforcing the automatic stay and remedying the stay violation.” Sternberg, 595 F.3d at 940. Thus, the litigation was “attenuated from the actual bankruptcy,” and her expenses paid thereafter not “actual damages.” Id. at 948.
B.
The majority confuses this simple analysis. First, the majority contorts language in Sternberg to improperly distinguish between “pursuit” and “defense” of an award of damages for a violation of the automatic stay. Second, in its fourth footnote, the majority opinion leads inextricably to a clear conflict with Sternberg.
1.
The majority ignores the holding in Sternberg, and instead misinterprets the next sentence of our decision. Majority Op. at 1099-1100. In that sentence, we stated that “[o]nce the violation has ended, any fees the debtor incurs after that point in pursuit of a damage award would not be to compensate for ‘actual damages’ under § 362(k)(l).” 595 F.3d at 947. The majority contorts this statement by emphasizing the phrase “pursuit of a damage award.” The majority distinguishes that “pursuit” from “defense” of a damages award. Majority Op. at 1100-01. The majority argues that if not for ASC’s appeal, “Schwartz-Tallard’s litigation of this matter would have been complete.” Id. at 1101. Citing the BAP, the majority also states that Schwartzr-Tallard “was forced to defend [the] appeal to validate the bankruptcy court’s ruling,” and thus “Sehwartz-Tallard was not using the stay as a sword.” Id. at 1101.
But this analysis is wrong. The discussion of the “pursuit of a damage award” is not the “specific[ ] h[olding]” of Sternberg, which is more properly characterized as I have stated above: “actual damages” is an amount awarded to compensate for “proven injury,” which in turn “is the injury resulting from the stay violation itself.” 595 F.3d at 947. Indeed, the correct interpretation of the Sternberg sentence the majority focuses on compounds its error: “once the violation [of the automatic stay has ended, i.e., by the latest May 10, 2010, when ASC could no longer attempt to retake Schwartz-Tallard’s property] any fees the debtor incurs after that point in pursuit of a damage award would not be to compensate for ‘actual damages’ under § 362(k)(l).” Id. That should end the dis *1108 cussion and we should reject the majority’s analysis.
Further, the majority (and the BAP) are wrong to conclude that Schwartz-Tallard was “forced” to defend ASC’s appeal. Had Schwartz-Tallard not defended the appeal, she would have lost the damages properly awarded to her for ASC’s violation of the automatic stay. But she would have retained her property. As of May 10, 2010, Schwartz-Tallard was in the same position as the debtor in Sternberg: had the debtor, Johnston, not sued the violators of the automatic stay in an adversary proceeding, he may not have ever received the damages award owed him. The adversary proceeding he filed, considered in this respect, was “an extension of [his] efforts to enforce [his] automatic stay.” Schwartz-Tallard, 473 B.R. at 349. But we held in Sternberg that Johnston could only recover “actual damages,” “even though it could be said he is not made whole as a result.” 595 F.3d at 947. Nor does our Sternberg statement that the automatic “stay is a shield, not a sword,” id. at 948, change our holding in that case denying damages to Johnston once he was finally returned to the status quo, even if he had to take legal action to maintain damages that were properly owed to him.
2.
The majority’s error is made plainest in its fourth footnote. The majority states in opposition to my reasoning that “[b]ecause ASC explicitly challenged the finding that the stay existed at the time of its foreclosure, and challenged whether its foreclosure sale had violated any stay, Schwartz-Tallard’s defense of that action was a continuation of her efforts to enforce the automatic stay.” Majority Op. at 1101 n. 4 (citation omitted). But regardless of ASC’s challenge to the finding that a stay existed when it foreclosed, the appeal could not lead to a retaking of Schwartz-Tallard’s property, because ASC waived any argument to that effect by its brief filed on May 10, 2010. That meant, by definition, the appeal had nothing to do with enforcing the automatic stay or remedying the stay violation, because the stay had been reinstated on March 3, 2010 when ASC returned the property to Schwartz-Tallard.
The majority’s reasoning leads to a statement that is obviously at odds with Sternberg. According to the majority, “[preventing violation of the automatic stay should contain at least litigation against stay violators in the bankruptcy courts to obtain a declaration of stay violation, and the defense of findings of stay violation on appeal.” Id. at 1101. In Stern-berg itself, Johnston, the debtor, filed an adversary proceeding against Sternberg, seeking an order that he had violated the automatic stay. 595 F.3d at 942. Ultimately, after Johnston’s motion was denied by the bankruptcy court but reversed by the district court, the bankruptcy court entered an order concluding that “Stern-berg wilfully violated the automatic stay.” Id. Regardless of the fact that Johnston had engaged in “litigation against stay violators in the bankruptcy courts to obtain a declaration of stay violation,” we refused to grant Johnston attorneys’ fees for his adversary proceeding. A debtor is not entitled for attorneys’ fees for litigation in the bankruptcy court that sought an order declaring a party in violation of the automatic stay, because “actual damages” “do[es] not include fees incurred in prosecuting the adversary proceeding to obtain damages.” Id. at 949.
The rest of the majority’s footnote fares no better. The majority states that under my theory, “efforts in the bankruptcy court to enforce the stay would be ineffective, because a stay violator could seek to *1109 avoid a finding of stay violation by filing an appeal, which the debtor would then be unable to defend for lack of attorneys’ fees.” Majority Op. at 1101 n. 4. If ASC had sought to reclaim Schwartz-Tallard’s property in its appeal, then Sehwartz-Tal-lard might be entitled to attorneys’ fees for defense of that appeal. But if all a stay violator seeks is a finding that the stay was not violated, and that it should not have to pay the damages associated with such a finding, then the appeal is not related to enforcing the automatic stay. “[A] plaintiff cannot ordinarily recover attorney fees spent to correct a legal injury as part of his damages, even though it could be said he is not made whole as a result.” Sternberg, 595 F.3d at 947.
Ultimately, the logic of the majority opinion does not follow. Both this case and Sternberg are governed by section 362(k)(l). How can the same statutory text require a bankruptcy court to award attorneys’ fees to Sehwartz-Tallard but bar a bankruptcy court from awarding attorneys’ fees to Johnston?
Sternberg controls this appeal. Our disposition should be quite simple under our holding in that case. Sehwartzr-Tallard was entitled to “actual damages” for ASC’s violation of the automatic stay. The violation of the stay ended after the status quo when Sehwartz-Tallard took back her property on March 3, 2010. Schwartz-Tallard’s defense of the appeal was not related to remedying the stay violation after ASC waived any claim to the property in its appellate brief in the district court, on May 10, 2010. Any attorneys’ fees Sehwartz-Tallard paid after that date are not “an amount awarded to compensate for proven injury or loss,” because the fees did not “result[ ] from the stay violation itself.” Id. I would reverse the BAP because of its misinterpretation of Stern-berg.
III.
But strangely enough, even if the majority is correct that Sternberg is not controlling, we should still reverse the BAP. If Sternberg does not control the outcome of this case, then there is no Ninth Circuit precedent governing this appeal, and we independently interpret the relevant statute to determine whether to award Sehwartz-Tallard the attorneys’ fees she seeks. The BAP apparently realized this and sought such an independent basis in its own precedent of In re Walsh, 219 B.R. 873 (9th Cir. BAP 1998). Schwartz-Tallard, 473 B.R. at 350. The majority cannot take refuge in Walsh, as it has correctly abandoned the BAP’s improper reliance on that decision because we overruled it in Sternberg. Majority Op. at 1102 n. 5. Of course, we all agree the BAP improperly relied on Walsh. But the legal sources on which the majority does rely are also not sufficient to grant Sehwartz-Tallard attorneys’ fees.
A.
If Sternberg does not control, although I would hold it does, we would have to assess independently whether to award Sehwartz-Tallard attorneys’ fees for her defense of the appeal from the Reconveyance and Sanctions Order. This is a question of statutory interpretation of section 362(k)(l), so we start with the text of the statute itself. In re Blixseth, 684 F.3d 865, 870 (9th Cir.2012). That section allows “an individual injured by any willful violation of a stay ... [to] recover actual damages, including costs and attorneys’ fees ...” 11 U.S.C. § 362(k)(1).
Although the plain language of the statute includes attorneys’ fees as “actual damages,” the term “actual damages” itself “is an ambiguous phrase.” Sternberg, 595 F.3d at 947. “Congress legislates *1110 against the backdrop of the ‘American Rule,’ ” whereby “parties are to bear their own attorney’s fees.” Id. at 945-46, citing Fogerty v. Fantasy, Inc., 510 U.S. 517, 533, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). Because of that backdrop and the ambiguity of the phrase “actual damages,” we only grant attorneys’ fees for “litigation attenuated from the actual bankruptcy” when Congress uses “explicit statutory language” to authorize the award of attorneys’ fees. Id. at 948; Hardisty v. Astrue, 592 F.3d 1072, 1076-77 (9th Cir.2010) (a statute that “creates an exception to the American rule” does not “extend[] fee-shifting to” a related circumstance, and “[i]n the absence of clear statutory text authorizing fee-shifting, we decline to become a ‘roving authority’ awarding attorneys’ fees”) (citation omitted).
B.
The text of section 362(k)(l) does not explicitly address the award of attorneys’ fees to litigants like Schwartz-Tallard. Awarding such fees is “a bold departure from traditional practice” and so usually requires “explicit statutory language and legislative comment.” Fogerty, 510 U.S. at 534, 114 S.Ct. 1023; see also Fulfillment Servs., Inc. v. United Parcel Serv., Inc., 528 F.3d 614, 624 (9th Cir.2008) (explaining that “[h]ad Congress aspired to such a radical departure [from the American Rule], it no doubt would have so indicated with explicit language to that effect”).
Legislative history that “is at best ambiguous ... is clearly insufficient to alter the accepted meaning of the statutory term,” “[pjarticularly in view of the ‘American Rule’ that attorney’s fees will not be awarded absent ‘explicit statutory authority.’ ” Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep’t of Health & Human Resources, 532 U.S. 598, 607-08, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); accord Kwai Fun Wong v. Beebe, 732 F.3d 1030, 1044 (9th Cir.2013) (en banc) (holding that “legislative history cannot supply a ‘clear statement’ ”). We do not generally allow “inferences from ... statutory purpose” to constitute an “unequivocal!] expression]” of legislative intent. See, e.g., Alaska v. E.E.O.C., 564 F.3d 1062, 1066 (9th Cir.2009). Indeed, we have specifically held that when a party seeking attorneys’ fees argues that the “purpose” of a statute supports awarding attorneys’ fees, we will not award attorneys’ fees if the cited statutory purpose reduces to “competing policy arguments,” because “[s]uch a debate is not enough to overcome the absence of statutory text authorizing supersession of the American Rule.” Hardisty, 592 F.3d at 1079.
C.
The majority first claims that the “plain language of [section 362(k)(l) ] includes attorneys’ fees in the definition of actual damages,” and states that “there is no reason to contort that language” to avoid awarding attorneys’ fees. Majority Op. at 1102. Though the majority is correct that the text of section 362(k)(l) allows attorneys’ fees as part of actual damages, it incorrectly concludes that this supports its holding. The question in this appeal is whether these attorneys’ fees are actual damages, an “ambiguous phrase.” Sternberg, 595 F.3d at 947. No plain language in the statute states that attorneys’ fees expended after a creditor waived any attempt to retake property are recoverable as actual damages. As we have recognized, if the plain text of a statute “creates an exception to the American rule,” we do not expand that text to award attorneys’ fees in a related circumstance not explicitly covered by the statute. Hardisty, 592 F.3d at 1076-77; see also Sternberg, 595 F.3d at 948 (refusing to award attorneys’ *1111 fees for “litigation attenuated from the actual bankruptcy” even though section 362(k)(l) specifically authorizes some attorneys’ fees). There is no “explicit statutory language” in section 362(k)(l) to support the majority’s conclusion. Fogerty, 510 U.S. at 534, 114 S.Ct. 1023.
The majority’s only other legal basis for awarding these attorneys’ fees is that “the fees incurred defending ... an appeal meet [the] Congressional purpose” behind section 362(k)(l) in that its “decision here is consistent with both the financial and non-financial purposes of the automatic stay that we emphasized in Sternberg.” Majority Op. at 1102. An inference from legislative purpose can never be “explicit statutory language and legislative comment,” Fogerty, 510 U.S. at 534, 114 S.Ct. 1023, and is thus insufficient to demonstrate Congressional intent to deviate from the American Rule. Alaska, 564 F.3d at 1066.
Indeed, the majority wrongly concludes that allowing Schwartz-Tallard to collect the attorneys’ fees is “consistent with both the financial and non-financial purposes of the automatic stay that we emphasized in Sternberg.” Majority Op. at 1102.
Allowing attorneys’ fees would not further the financial goals of the automatic stay recognized in Sternberg. ASC was a creditor of Schwartz-Tallard. “We have never said the stay should aid the debtor in pursuing his creditors, even those creditors who violate the stay.” Sternberg, 595 F.3d at 948. If Schwartz-Tallard had not defended ASC’s appeal, she would never have been able to recover the damages her creditor owed her, but the “stay is a shield, not a sword.” Id. The economic purpose of the stay, to give Schwartz-Tallard time to put her finances back in order, would not be served if she were encouraged to continue to retrieve money from her creditor.
Nor does awarding attorneys’ fees further the noneconomic purpose of the stay recognized in Sternberg. “More litigation is hardly consistent with the concept of a ‘breathing spell.’ ” Id. By defending against ASC’s appeal, Schwartz-Tallard only created more litigation “attenuated from the actual bankruptcy.” Id.
I understand that my suggestion that Schwartz-Tallard could have simply not defended ASC’s appeal may seem unfair, but it is perfectly consistent with the “breathing spell” inherent in the automatic stay. It is also consistent with our recognition that the American Rule disfavors granting attorneys’ fees “even though it could be said [the debtor] is not made whole as a result.” Id. at 947.
Thus, I do not believe the supposed purposes of the automatic stay divined by the majority clearly weigh in favor of Schwartz-Tallard. Like many disputes over statutory purposes, the majority’s argument and what it calls Sternberg’s “policy analysis,” Majority Op. at 1100 n. 2, “at most confronts us with competing policy arguments,” which are not enough to overcome the background “American Rule” that each party bears its own costs. Hardisty, 592 F.3d at 1079. Thus, even if Sternberg does not compel the outcome of this case, I would still reverse the BAP because there is no “explicit statutory language and legislative comment” authorizing a departure from the traditional practice that Schwartz-Tallard should bear her own attorneys’ fees. Fogerty, 510 U.S. at 534, 114 S.Ct. 1023.
IV.
Although the majority errs in affirming the BAP, the majority is correct in its footnote to deem the BAP’s reliance on the decision in Walsh “improper.” Majority Op. at 1102 n. 5. I agree with the majority *1112 on this point for a fundamental reason: the BAP cannot rely upon any of its own precedent that we have overruled without creating serious constitutional problems.
A.
The Constitution vests the “judicial power of the United States” in the Supreme Court and inferior courts. U.S. Const, art. Ill, § 1. The federal judges subject to Article III “hold their Offices during good Behavior,” which means they have lifetime tenure unless impeached, and their “Compensation [ ] shall not be diminished during their Continuance in Office.” Id.
Congress has the power to create certain other federal tribunals under its constitutionally delegated powers found in Article I. One type of federal tribunal acts as an “adjunct” to the Article III federal courts, a term used by the Supreme Court to describe the role of certain administrative agencies and the magistrate courts. N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 77, 102 S.Ct. 2858, 78 L.Ed.2d 598 (1982) (plurality), describing Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (administrative agencies) and United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (magistrate courts). For instance, the magistrate courts are subject to the Article III district courts in the district in which they are located. “[T]he district court has plenary discretion whether to authorize a magistrate to hold an evidentiary hearing,” and “the magistrate acts subsidiary to and only in aid of the district court,” so that “the entire process takes place under the district court’s total control and jurisdiction.” Raddatz, 447 U.S. at 681, 100 S.Ct. 2406.
But Congress does not have plenary authority to create federal tribunals. Congress cannot grant jurisdiction over cases that are rightfully within the “judicial power of the United States” described in Article III to an Article I tribunal without violating the Constitution and its separation of powers principle. N. Pipeline, 458 U.S. at 63-64, 102 S.Ct. 2858 (plurality). Likewise, if Congress vests “essential attributes” of the judicial power to an Article I adjunct that is not subject to searching review by an Article III court and that can issue binding and enforceable final judgments, the enacting law also violates the Constitution. Id. at 85-86, 102 S.Ct. 2858 (plurality).
Under the Bankruptcy Reform .Act of 1978, Congress dramatically altered the existing bankruptcy system to modernize the bankruptcy laws. S. REP. No. 95-989, at 1 (1978), 78 U.S.C.C.A.N. 5787. Congress replaced the bankruptcy “referees” from the Bankruptcy Act of 1898 with bankruptcy “judges” with far more power to resolve bankruptcy disputes. Id. at 2-3. The Reform Act also authorized the judicial councils of the circuits to order the chief judge of the circuit to designate panels of three bankruptcy judges to hear appeals from judgments, orders, and decrees of each bankruptcy court. Pub.L. No. 95-598, title II, § 201, adding 28 U.S.C. § 160. These “bankruptcy appellate panels,” composed of bankruptcy judges, had jurisdiction of appeals from all final judgments, orders, and decrees of bankruptcy courts, as well as interlocutory judgments, orders, and decrees, if the panel granted leave. Id., title II, § 241, adding 28 U.S.C. § 1482. Under the 1978 Act, if a Judicial Council of a circuit authorized a BAP, all appeals from decisions of bankruptcy judges had to be heard by that BAP, unless all parties stipulated to have the appeal taken to the court of appeals. Thomas E. Carlson, The Case for Bankruptcy Appellate Panels, 1990 B.Y.U. L. REV. 545, 546-47. Only the Judicial Councils of the First and Ninth Circuits *1113 authorized the BAP, and our circuit did so only for certain district courts. Id. at 547.
B.
In Northern Pipeline, the Supreme Court struck down the composition and jurisdiction of the bankruptcy courts enacted under the 1978 Act. 458 U.S. at 77, 102 S.Ct. 2858 (plurality); id. at 91-92, 102 S.Ct. 2858 (Rehnquist, J., concurring). In that fractured decision, a four-justice plurality concluded that the bankruptcy courts as constituted exercised jurisdiction over cases properly assigned to the Article III federal courts under the Constitution, id. at 63-76, 102 S.Ct. 2858, and that the bankruptcy courts possessed too much power, with too little scrutiny by Article III federal courts, to be constitutionally acceptable adjuncts. Id. at 84-87, 102 S.Ct. 2858. Justices Rehnquist and O’Connor concurred with both propositions, though on narrower grounds. Id. at 90-91, 102 S.Ct. 2858 (Rehnquist, J., concurring) (without wholly addressing the general framework for adjudication of Congressional authority to create Article I courts, nonetheless agreeing that Article I tribunals cannot adjudicate certain types of common law actions and that the bankruptcy courts under the 1978 Reform Act were not constitutionally acceptable adjuncts because the only way for review by an Article III court was through “traditional appellate review”). Because the Court agreed that the decision involved an “unprecedented question of interpretation of [Article III],” it applied the rule only prospectively, and did not disturb previous orders of the bankruptcy courts. Id. at 87-88, 102 S.Ct. 2858 (plurality).
In light of Northern Pipeline, the Judicial Conference of the United States issued a model “Emergency Rule” that was adopted by all of the district courts in the Ninth Circuit. See In re Burley, 738 F.2d 981, 984 n. 2 (9th Cir.1984). Under the Rule, “the district courts referred] all bankruptcy cases and proceedings to bankruptcy judges, who make recommendations and enter certain orders and judgments on behalf of the district court, subject to later district court review.” Id.
The Bankruptcy Appellate Panel of the First Circuit reviewed the constitutionality of the BAP soon after Northern Pipeline, and concluded that although Northern Pipeline itself had not struck down review of bankruptcy decisions by the BAP, under the principles the Supreme Court recognized, BAP review “violates Article Ill’s command that the judicial power must be vested in Article III courts.” In re Dartmouth House Nursing Home, 30 B.R. 56, 62 (1st Cir. BAP 1983). The First Circuit affirmed, not because the BAP violated the Constitution, but instead because it held that the Emergency Rule promulgated by the Judicial Council of the First Circuit “had the implicit effect of withdrawing from [the BAP] their earlier conferred authority to hear appeals.” Massachusetts v. Dartmouth House Nursing Home, 726 F.2d 26, 29 (1st Cir.1984).
A few months later, we reviewed a decision from the BAP that was entered after Northern Pipeline. Burley, 738 F.2d at 985-87. We focused on the constitutionality of the BAP because unlike in the First Circuit, our order adopting the Emergency Rule “expressly provided] that the BAP shall” continue to hear appeals if the underlying bankruptcy order was entered before Northern Pipeline went into effect. Id. at 985 n. 3. Unlike the BAP of the First Circuit, we concluded that the bankruptcy appellate panels were not unconstitutional. This was because, unlike in Northern Pipeline, the Article III court of appeals, rather than the BAP, retained the “essential attributes of the judicial power.” Id. at 985. We may overturn the BAP’s deci *1114 sions “more freely” than the district courts could overturn the bankruptcy courts under the 1978 Bankruptcy Act, and thus “effectively” review their decisions de novo. Id. at 985-86. We concluded that the BAP meets the constitutional requirements for an adjunct tribunal, because we review their decisions de novo, retain full power to make final decisions, and retain control over the BAP through the discretionary choice to establish the panel by order of the Judicial Council of the Circuit. Id.
In response to Northern Pipeline, and soon after we had affirmed the constitutionality of the BAP in Burley, Congress passed the “Bankruptcy Amendments and Federal Judgeship Act of 1984.” Pub.L. No. 98-353. Under that statute, the BAP could only hear an appeal from a bankruptcy judge if “all the parties” consented, and the court of appeals had appellate jurisdiction over any final decision, judgment, order or decree issued by the BAP. Id. at § 104, inserting 28 U.S.C. § 158. In August 1984, our Judicial Council of the Circuit reestablished our BAP pursuant to the new statute, but no other circuit joined us. Thomas A. Wiseman, Jr., The Case Against Bankruptcy Appellate Panels, 4 Geo. Mason L.Rev. 1, 2 (1995).
Because we were the only circuit to create a BAP, Congress modified the bankruptcy appeals statute in 1994 to require that the judicial council of each circuit establish a BAP unless the council decided that it did not have sufficient judicial resources or that the creation of the BAP would create undue delay or increased costs. 28 U.S.C. § 158(b). Since 1994, we have been joined by the First, Sixth, Eighth and Tenth Circuits. Jonathan Remy Nash & Rafael I. Pardo, An Empirical Investigation into Appellate Structure and the Perceived Quality of Appellate Review, 61 Vand. L.Rev. 1745, 1757 (2008).
The Judicial Council of the Ninth Circuit has continued the BAP’s service after the 1994 statutory modifications. See Judicial Council of the Ninth Circuit, “Amended Order Continuing the Bankruptcy Appellate Panel of the Ninth Circuit” (effective November 18, 1988; as amended May 4, 2010). Under current Ninth Circuit BAP practice, seven active bankruptcy judges from districts within the Ninth Circuit are authorized to serve on the BAP. Each appeal is heard by a panel of three judges, but no judge can hear an appeal originating from his or her district. Bankruptcy Appellate Panel of the Ninth Circuit Lit. Manual § III. An appeal from the bankruptcy court automatically goes to the BAP unless any party timely elects for the district court to hear the appeal. 28 U.S.C. § 158(c)(1). In certain exceptional bankruptcy cases filed after the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, parties can bypass both the BAP and district court and appeal directly to the Court of Appeals. See Blausey v. U.S. Trustee, 552 F.3d 1124, 1129-30 (9th Cir.2009). The BAP has jurisdiction over certain interlocutory orders. 28 U.S.C. §§ 158(a)(2), (a)(3) & (c)(1).
C.
Because the BAP is an Article I tribunal, we have consistently recognized that its decisions cannot bind us, or in fact any Article III court. In re Silverman, 616 F.3d 1001, 1005 n. 1 (9th Cir.2010) (“we treat the BAP’s decisions as persuasive authority given its special expertise in bankruptcy issues”) (emphasis added); In re Cardelucci, 285 F.3d 1231, 1234 (9th Cir.2002) (“this Court is not bound by a[BAP] decision”); Bank of Maui v. Estate Analysis, Inc., 904 F.2d 470, 472 (9th Cir.1990) (stating that “it must be conceded *1115 that BAP decisions cannot bind the district courts themselves. As article III courts, the district courts must always be free to decline to follow BAP decisions and to formulate their own rules within their jurisdiction”). The BAP has also long recognized that our decisions are binding on them, rather than the other way around. See, e.g., In re Ball, 185 B.R. 595, 597-98 (9th Cir. BAP 1995) (“[w]e will not overrule our prior rulings unless a Ninth Circuit Court of Appeals decision, Supreme Court decision or subsequent legislation has undermined those rulings”).
Relatedly, we vacate any BAP decisions and judgments based on reasoning that we have overruled or rejected. See, e.g., In re Ransom, 302 Fed.Appx. 567 (9th Cir.2008) (“Under [a Ninth Circuit case] which came down after the bankruptcy appellate panel had ruled, the provisions of the confirmed plan have preclusive effect. [The Ninth Circuit case] controls. It expressly overruled the bankruptcy appellate panel decision in this case. Accordingly, the judgment of the bankruptcy appellate panel is vacated”) (citation omitted).
This discussion of the BAP’s subordinate role is not academic. The control we exercise over the BAP and its decisions is necessary to justify the very existence of that court. See, e.g., N. Pipeline, 458 U.S. at 87, 102 S.Ct. 2858 (plurality); id. at 91, 102 S.Ct. 2858 (Rehnquist, J., concurring). If an Article I tribunal were to “exercise jurisdiction over all matters related to those arising under the bankruptcy laws,” id. at 76, 102 S.Ct. 2858 (plurality), or infringe upon “essential attributes of the judicial power” without sufficient scrutiny by an Article III court, id. at 86-87, 102 S.Ct. 2858 (plurality), we would have to “emphatic [ally]” reassert “the integrity of the system of separated powers and the role of the Judiciary in that system” by striking down the offending Article I tribunal, even if its infringements “may seem innocuous at first blush” and only “chip away at the authority of the Judicial Branch.” Stern v. Marshall, — U.S. -, 131 S.Ct. 2594, 2620, 180 L.Ed.2d 475 (2011).
D.
In 1998, the BAP issued its decision in In re Walsh, which stated that “if appellate fees and costs are” not awarded, “then the injured party is not made whole,” and thus held that “[c]learly, fees and costs experienced by the injured party in resisting the [stay] violator’s appeal are part of the damages resulting directly from the stay violation” under the predecessor to section 362(k)(l). 219 B.R. 873, 878 (9th Cir. BAP 1998). In Sternberg, we specifically rejected this interpretation of the statute. 595 F.3d at 947 (“The Bankruptcy Appellate Panel, for example, seems to view ‘actual damages’ as requiring an award that returns a debtor to the position he was in before the stay violation occurred. See Beard v. Walsh (In re Walsh), 219 B.R. 873, 878 (9th Cir.BAP1998) (rejecting an alternative reading of the statute under which, according to the BAP, ‘the injured party is not made whole’).... In contrast, we conclude that the plain meaning of ‘actual damages’ points to a different result”) (alterations omitted).
In the present appeal, the BAP cited and relied on Walsh’s precise holding, explaining that “Sternberg admittedly rejected the BAP’s determination in Walsh that § 362(k)’s predecessor, § 362(h), required an injured party to be made whole. At the same time, Sternberg did not invalidate Walsh’s finding that damages incurred on appeal are actual damages directly resulting from the stay violation itself.” Schwartz-Tallard, 473 B.R. at 350 n. 12.
*1116 In fact, we specifically overruled Walsh, even mentioning it by name. Sternberg, 595 F.3d at 947. We also specifically rejected the broader holding of Walsh that “actual damages” required “an award that returns a debtor to the position he was in before the stay violation occurred.” Id. The BAP was flatly wrong.
E.
The BAP’s citation to a precedent we specifically rejected is not only unacceptable under our precedent and its own deci-sional law. Ransom, 302 Fed.Appx. at 567; In re Ball, 185 B.R. at 597-98. The reliance on such precedent is an attack on Article III of the Constitution. N. Pipeline, 458 U.S. at 86-87, 102 S.Ct. 2858 (plurality). For an Article I tribunal to rely on precedent that we have expressly rejected may infringe upon the “essential attributes of [our] judicial power.” Id.
This constitutional concern is particularly evident in the two classes of BAP decisions that we do not review on appeal. As Judge Norris observed, we do not review the BAP when the losing party does not appeal the adverse decision from the panel, and when the BAP decides a non-final bankruptcy order under its interlocutory jurisdiction. Burley, 738 F.2d at 989-93 (Norris, J., dissenting). If the BAP were to deviate from our authoritative decisions, and instead were to apply its own law in either of these two circumstances, it would very likely trammel essential attributes of our judicial power and thus violate the Constitution.
First, not all BAP cases are appealed by the losing party. Id. at 990-92 (Norris, J., dissenting). In those circumstances, there is “no direct article III control over [the] individual case[].” Id. at 992 (Norris, J., dissenting). If the BAP were not to follow federal law as stated in our decisions, and if the party subject to that decision were to lack the resources to rectify the BAP’s error, that party would be bound erroneously by an Article I tribunal.
Second and more worrisome, the BAP has jurisdiction over some interlocutory bankruptcy orders that we do not have appellate jurisdiction to review. Id. at 992-93 (Norris, J., dissenting); see also In re Lievsay, 118 F.3d 661, 663 (9th Cir.1997) (per curiam) (dismissing an appeal from a BAP decision on an interlocutory order). If the BAP were to ignore our precedent in such a case, the losing party would have no recourse to rectify the error until the bankruptcy court issued a final order, and could be bound for years by this improper interpretation of federal law by an Article I tribunal. That, I suggest, would clearly violate the separation of powers doctrine by infringing upon our judicial power under Article III.
I do not contend that the BAP is consistently ignoring our opinions, or that it has done so in a case we have not reviewed. But all subordinate courts must follow the authoritative decisions of higher courts. See, e.g., United States v. McCalla, 545 F.3d 750, 753 (9th Cir.2008) (stating that to the extent the defendant seeks to “set aside or disregard United States Supreme Court precedent, we simply cannot accommodate him. As the Supreme Court has expressly stated, ‘it is this Court’s prerogative alone to overrule one of its precedents,’ ” citing State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)). The BAP, which is a subordinate tribunal created by Congress and authorized by our Judicial Council of the Circuit, must be particularly careful to follow our precedents, and must never ignore them in favor of its own decisions, lest it infringe upon the essential attributes of our judicial power, created by the higher law of the United States Constitution. In such a *1117 case the correcting power would be action by the Judicial Council of the Circuit.
V.
The majority incorrectly holds that our decision in Sternberg does not control this case. I am convinced to the contrary. Even if the majority were correct, however, it cites no persuasive basis for awarding attorneys’ fees to Schwartz-Tallard.
The BAP’s decision to ignore our binding precedent raises serious threats to the separation of powers. The majority, the BAP, and some out-of-circuit judges, cited at Majority Op. at 1100 n. 2, fundamentally disagree with our holding in Sternberg. If they are correct, the proper outlet for review of our decision is our court en banc or the Supreme Court. The BAP is a subordinate court, bound to follow our decisions, and as a three judge panel, we must follow prior panel precedent, whether or not the decisions were decided incorrectly or have been criticized by other courts. Miller v. Gammie, 335 F.3d 889, 900 (9th Cir.2003) (en banc). I dissent.